[Crim. No. 9084. First Dist., Div. One. Feb. 16, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES MARTIN GURLEY, Defendant and Appellant.

## Counsel

Michael H. Metzger and Daniel H. Weinstein for Defendant and Appellant.

Evelle J. Younger, Attorney General, Robert R. Granucci and Eugene Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SIMS, J.**—Defendant has appealed from a judgment—order suspending execution of a sentence to prison and granting the defendant probation—following his conviction of possession of heroin in violation of section 11500 of the Health and Safety Code, by his plea of guilty. The plea followed the denial of his motion to suppress evidence, and the appeal is entertained pursuant to the provisions of subdivision (m) of section 1538.5 of the Penal Code. Defendant contends the trial court erred in holding that he had validly consented to a search of the vehicle in which the heroin he was convicted of possessing was found.[1] It is concluded that there was suffi-

---

[1] In connection with the motion to suppress the parties also briefed the issues of whether the seizure was warranted in the absence of consent because there was probable cause to search the vehicle, because the search and seizure were incident to

cient evidence to sustain the finding of the trial court that the defendant voluntarily consented to the search of his car, that, in any event, the officers were entitled to rely upon his objective manifestation of consent, that there was probable cause to search the defendant's vehicle for contraband, and that the officer was entitled to seize the paraphernalia and accompanying containers which were in plain sight.

The seizure of the contraband and the charges of which defendant stands convicted arose out of the following tragic circumstances. On the afternoon of July 6, 1969, defendant James Martin Gurley, his wife Nancy, and their 3-year-old son, Hongo, were camping at a location on the Russian River approximately 10 miles from Cloverdale, California. After spending most of the afternoon boating on the river, the family returned to their campsite for dinner. Between the hours of approximately 7 and 10 p.m., the defendant spent his time fishing and eating dinner. During that time he had a number of glasses of wine. At approximately 10 p.m. defendant went to his vehicle (a Toyota jeep, parked on a dirt road near the campsite) and administered, to himself, an injection of heroin. Because he was "high" on wine, he inadvertently injected himself intramuscularly. At this point Nancy approached the vehicle and requested the defendant's assistance in administering a shot of heroin to herself. Aided by defendant, Nancy Gurley received an intravenous injection of heroin and proceeded back to the campsite. Because of the failure to reach a vein on his first injection, defendant administered another injection to himself and again, because of being under the influence of the wine, he missed his vein. Defendant shortly thereafter, upon arriving at the campsite found his wife unconscious and in a comatose condition. After a frenzied attempt at artificial respiration, he carried his wife and son back to his vehicle and drove into Cloverdale seeking medical assistance. His first stop was at a gas station where he was directed to the offices of Dr. Lombard Sayre. The gas station attendant, having seen the defendant's agitated condition, immediately notified the Cloverdale police.

Defendant arrived at Dr. Sayre's office and was shortly thereafter met

the arrest of the defendant, or because the seized articles were in plain sight. At oral argument the judge indicated that he did not believe the seizure was incident to any arrest; that there was no emergency such as usually attends an authorized warrantless search of a vehicle; and that although the paraphernalia and the box containing the heroin were in plain sight, the heroin itself was not and so the prosecution could not rely upon that justification. He concluded, however, that there was an intelligent waiver of rights. The review here is limited to the propriety of the order, and if the record sustains the search and seizure on any ground, even though that ground was rejected by the trial court, the order and the ensuing judgment must be sustained. (See *People* v. *Superior Court* (1970) 3 Cal.App.3d 476, 490-492 [83 Cal.Rptr. 771]; and *People* v. *Cohen* (1969) 1 Cal.App.3d 94, 104 [81 Cal.Rptr. 503] [revd. on other issues (1971) 403 U.S. 15 (29 L.Ed.2d 284, 91 S.Ct. 1780)].)

by Dr. Sayre who had also been notified by the gas station attendant. Defendant thereafter carried his wife into the office. Dr. Sayre, after a brief examination, advised defendant that his wife was dead. After ascertaining some of the foregoing circumstances from the defendant the doctor telephoned the police. Defendant, although having been advised that his wife was dead, persisted in attempting to bring her back to life by breathing into her mouth.

Moments later, Officers Waller and Green of the Cloverdale Police Department arrived, and after a brief discussion with the doctor, removed defendant from his wife's body. Officer Green gave the defendant a *Miranda* warning and proceeded to question him regarding the circumstances of his wife's death. During the questioning, the officers learned that heroin was in the glove compartment of defendant's car which was, at that time, parked in the vicinity of the clinic. After asking defendant whether they could get the heroin, and securing his permission, Officer Waller proceeded out to the car and observed, in the glove compartment, the item he had described, a white box wrapped in a red rubber band. Officer Waller retrieved this box along with a spoon and a candle, and brought these items into the clinic. Once in the clinic, an examination of the box was made and it was found to contain a very small quantity (2/10 gram) of a white powder which proved to be heroin.

On the recommendation of Dr. Sayre, Officer Green ordered Gurley taken to the Sonoma County Hospital Psychiatric Facility on a 72-hour treatment and evaluation hold. At approximately 12:30 a.m., Bell Ambulance Service transported Gurley and Hongo to the Sonoma County Hospital where the defendant was admitted at approximately 1:35 a.m. The evidence relating to the defendant's condition at the time he was interrogated by the police and consented to the officers' retrieving the heroin is discussed below.

## I

Defendant contends that his rational intellect and free will were so severely impaired by the dual effects of his physical intoxication from alcohol and heroin, and his emotional stress from the psychological shock of his wife's death, that the asserted waiver made by him at the very peak of his emotional upheaval cannot be deemed "voluntary" under applicable constitutional standards.

The defendant testified that he did not know what transpired from the time he was taken into another room, after futilely attempting to revive his wife with mouth to mouth resuscitation, until he "woke up" to find him-

self in the hospital. He also testified that he only recalled a dark room "filled with people." He did not remember or recognize Officers Waller and Green, Dr. Sayre or the ambulance attendant who accompanied him to the hospital. He relies on the testimony of observers, and of expert witnesses to support his contention that he was unable to understand the nature of the conversation in which he apparently engaged.

Officer Green testified that the defendant was sitting in a chair with his naked son in his lap, rocking back and forth and sobbing "Nancy, Nancy, Nancy, no, no no"; that he was concerned that the defendant was going to fall forward off the chair. During his testimony Green described the defendant as "upset," "excited," "crying," "sobbing," "passive" and "hysterical"; and in his report he wrote, "During questioning by the officers, suspect went hysterical, crying and talking to himself."

Dr. Sayre characterized the defendant as "hysterical" and at times "unable to communicate or understand what was happening or had happened." Dr. Sayre indicated that by "hysterical" he referred to "One who spends most of his time at least in a state of disconcern for the rest of what's happening in this world. A man who sits and rocks back and forth with a child on his lap, crying, repeating words over and over again." Dr. Sayre recommended that the defendant be committed to a psychiatric ward because he was in no condition to be left by himself. The doctor requested the officer to sign the form for the defendant's detention when he found it necessary in order to have the defendant admitted.

The ambulance attendant described the defendant as "hysterical," "crying" and "irrational" through the half-hour trip to the hospital. Defendant sobbed over and over, "What are we going to do. Nancy isn't here. Hongo, what are we going to do. Nancy isn't here." The attendant stated that the defendant, who was secured to a gurney with restraining belts, kept throwing his head back and forth and flailing with his arms against the side of the ambulance.

On defendant's admission to the hospital, the examining physician described him as "an acutely hysterical male who keeps hollering his wife's name. . . . Patient is a long-haired bearded young male in acute psychiatric distress." The doctor found that defendant's pupils were too constricted to give him a routine fundoscopic examination.

At about 1:15 a.m., Deputy Sheriff Henshaw interviewed defendant in the emergency room at the hospital. He testified that defendant was "crying hysterically" when he first observed him; that the only time defendant appeared coherent was when he asked defendant about his son, his age, and the name and address of his parents; that he lifted the defendant's head so

he could be sure that the defendant recognized him as a police officer; and that defendant continually sobbed and cried and repeated, "Nancy, Nancy, Nancy."

The following day in response to a question by another officer defendant indicated that he had not previously been instructed concerning his rights.

Defendant's testimony indicated that he ingested about four glasses of wine. He stated that he had first begun using heroin in December 1968, and used it with varying intensity in the months preceding the tragedy; and that he was attempting to taper off by infrequent usage in July. He stated that the two injections he took intramuscularly, and the one taken by his wife intravenously, each consisted of an eighth of a teaspoon of the narcotic, mixed with water by heating, and drawn up into a syringe. A test indicated that the heroin used was of a high potency (15 percent by weight) twice the strength of most "street" heroin. The prosecution's witness indicated that a urine test was consistent with the administration of 10 milligrams at 9 p.m. on the evening in question, and that 10 milligrams would be a heavy intravenous dose for a sporadic user who had not developed a tolerance to use of the drug.[2]

Dr. Rappolt, a physician specializing in clinical toxology, testified that he had reviewed all of the available data and interviewed the defendant. He opined that the defendant's mental capacity was substantially affected by the heroin he had taken; that the defendant did not recognize he was in jeopardy, was not fearful, and more or less gave yes and no answers and tried to cooperate with everybody because he was in a doctor's office. He stated that the heroin would distort the defendant's sensory input generally, and specifically visually because his pupils were constricted.

Dr. Martin Blinder, a qualified physician and psychiatrist, also examined all of the available data. He stated that a 10 milligram dose of heroin would be a substantial dose and would have a pronounced effect on the taker in that the drug will alleviate anxiety and worry, and would have the psychological effect of eliminating a sense of danger—that sophisticated ability to comprehend the real meaning of one's environment. He concluded, "I feel quite certain that the amount of heroin that Mr. Gurley took, though I'm not certain exactly how much it was, still left him with sufficient euphoria to, in effect, bring a veil down between him and reality, not that he was totally out of touch with it but there was a veil there and that this veil significantly

---

[2]One expert testified, "We know it had to be good heroin because it killed somebody." There is an indication that evidence of heroin or morphine was found in the organs of defendant's deceased wife, but no attempt was made to go into the manner in which her death was occasioned, that is directly or indirectly from the heroin she took.

impaired his ability to comprehend the true significance of what was being said to him.

"Although he might have understood the factual contents, he wouldn't understand the significance, and it further impairs his ability to further create the consequence and significance of his own words." Dr. Blinder also opined that the alcohol ingested by the defendant would increase the foregoing impairment and would have a synergistic effect in relieving the defendant's anxiety.

In response to a hypothetical question, which encompassed the physiological and psychological factors to which defendant was subjected at the time he conversed with the officers, Dr. Blinder opined that the defendant's capacity to exercise his rational intellect and free will in waiving his rights was markedly impaired. In elaboration the doctor stated, "I have no doubt he could hear these questions and respond to them but that the parts of him, the mature weighing judgmental foresight portions of his brain were, in fact, diminished. He did not have access to these parts, so he would not be capable of those rather sophisticated functions you described of exercising free will and rational comprehending of the full significance of these questions." Dr. Blinder equated the defendant's condition to a 5-year-old child who could hear questions and answer them without understanding their significance. He opined that the defendant would not appreciate the incriminating significance of the kind of things he would be saying because of the enormous emotional impact of what he had just experienced.

He restated his conclusion by testifying that because of the defendant's emotional state it was extremely unlikely that the defendant had had the capacity to voluntarily, knowingly and intelligently understand and waive the rights described to him by Officer Green. He stated, ". . . the parts of his brain that would attend to the legal situation, the legal import of what he had done, the fact that he had played a large part in his wife's death and that there were certain legal consequences to this, the idea of thinking about this affecting yourself, or to paint yourself in the best possible light, these parts of the brain were not operative at that point." The doctor further opined that the defendant was in a numbing process where he could not fully assimilate the fact of his wife's death, a dream state in which he was unable to perform certain sophisticated functions of maturely weighing some complicated information.

On cross-examination the doctor acknowledged that it was possible that the defendant could have calmed down and have given the doctor and the officers concise, complete and coherent answers and statements, and realized what he was doing. Dr. Blinder believed, however, that such answers

were of little value and that defendant's appreciation of the significance of the question was markedly impaired both when he was showing his hysteria by running around, and when he was sitting like a numb zombie, because he was in almost a hypnotic complacent state.

On the other hand, it appears from the testimony of Dr. Sayre that the defendant was completely and totally cooperative as far as giving the doctor any information he wanted that in any way could help his wife. The doctor inquired about his wife because it was a sudden and unexpected death. He told the doctor the time she injected the heroin, where they had been, and the events leading him to bring her to town. Defendant's mind and attention were focused on his concern for his wife, and subsequently his concern for his son. The doctor indicated that he did not discuss any other matters with the defendant, and that there were no other matters for which defendant showed a concern. The doctor concluded, "I would say at times that he was hysterical and unable to communicate or understand what was happening or had happened, and at times he was completely alert to anything that would help his wife in any way whatsoever, or his son."

Dr. Sayre testified that although he heard the officers and the defendant talking, he did not hear the conversation and could not remember their statements because he was concerned about making some phone calls on other matters. The doctor opined in response to a question relating to the defendant's ability to converse with the officers, "If they got his attention and if he was talking coherently, then they got his attention and he was talking coherently. If they didn't get his attention, they didn't get it. I don't know." He did not believe that the defendant was in such a state that he could not give the officers information that would be useful to them and accurate at the time, just as he had given the doctor, himself, information that appeared to be correct. He concluded, "From my talking with Mr. Gurley, if the information had anything to do with his wife, his wife's death, or the care of his son, everything he told me was precise and I assume if it was told to someone else, it would be precise to him too." Because the doctor did not discuss any other matters with the defendant, he could not comment on whether or not the defendant would give accurate information in other areas.

A qualified toxicologist testified that from his examination of a urine specimen taken from the defendant on the following day he concluded that the defendant could have taken about 10 milligrams of heroin at 9 p.m. on the preceding evening. In response to a question concerning the general effect of heroin upon the human system, he replied, "This is determined by a number of factors. One is the patient, the receiver, and another is the amount of heroin and how it is taken. In general, the action of heroin is

that of a narcotic analgesic. Its principal action is to raise the threshold of the individual to pain. It's also a depressent of the central nervous system where it acts to depress activities. [¶] Taken in certain ways, it has a principal effect of euphoria, particularly when it's taken intravenously, a sensation of well-being, warmth." With respect to the dosage he believed to have been taken by the defendant, he stated, ". . . if the amounts that were taken that I described previously . . . the effect at 11:40 [p.m.] . . . would be very minimal. There would not be sufficient level present at that time to have any appreciable effect on mental awareness or alertness whatsoever. There would perhaps be sufficient quantity to have present some analgesia because this is the principal action of the drug. There would be perhaps sufficient quantity to have some depression of the central nervous system. But there would be no more depression than we would expect from four shots of bourbon, however, which is known not to appreciably affect the mind."

Officer Green first observed the defendant as he was kneeling down over his deceased wife attempting to administer artificial resuscitation. When he ascertained from Dr. Sayre that there was no use in the defendant's continuing, Green and Officer Waller helped the defendant up and took him into the dimly lighted waiting room. Green testified that the defendant was crying, but that he and Waller talked to him for two or three minutes and calmed him down. Green left the defendant with his naked son in his lap, and returned to talk to the doctor. In response to the officer's inquiry concerning the cause of death the doctor told him he believed it was an overdose of heroin or impure heroin because the defendant had told him that he and his wife were shooting heroin earlier that evening.

The officer covered up the deceased with a blanket. The defendant became quite excited again and while crying and rocking back and forth in the chair repeated his wife's name over and over to the point of being quite loud. The officer talked to defendant for a minute or two, tried to console him, and calmed him down again. Officer Green returned and discussed with the doctor his earlier statement which was repeated by the doctor. The officer returned to the defendant and asked, and was told, his name and address. He talked to the defendant a few more minutes and requested him to take it easy. When he seemed to calm down, Green questioned him about his wife's death.

Officer Green first read defendant a *Miranda* warning from a card. He asked defendant "Do you understand each of these rights I have explained to you?" and the defendant answered "Yes." He also answered "Yes" when asked, "Having these rights in mind, do you wish to talk with us now without the presence of a lawyer?" Although defendant was still crying, he

had stopped his rocking motion back and forth, and had stopped repeating his wife's name.

Green asked defendant what happened, and the defendant told him that his wife, his son and himself were camped on the Russian River approximately a half mile soulth of Ash Creek; that he had given himself and his wife a fix of heroin; that he took twice as much as his wife; that after administering this shot his wife became unconscious and he was unable to arouse her; that he picked her up, put her in his car and proceeded to Cloverdale looking for a doctor; and that he couldn't understand why it affected his wife like it had, because he had taken the same stuff and it had not bothered him. Green then asked him if he had the heroin and the injection kit on his person or in his possession. Defendant said no, and volunteered that it was in the glove compartment of his car and described its appearance to the officers. Green then asked him if he had any objection to Officers Waller and himself going out to the vehicle to obtain the stuff, and defendant replied "No" that it would be all right.[3] Green informed defendant that he didn't have to let the officers go out to the car if he did not want to. The defendant replied that he understood and said, "Go ahead."

At no time did Green have any difficulty in understanding what the defendant was saying, and what the defendant said was intelligible. The defendant was courteous and cooperative and answered all the questions Green asked him. Defendant's account of what happened was in narrative form and was not elicited by questions, which "were very few and far between." It was unnecessary to keep him going. The narrative was not interrupted by references to his sorrow for his wife's death or his concern for his son, and it was unnecessary to console him during that time.

Officer Waller went to the car and returned with a small white box with a red rubber band around it, as described by defendant. This proved to contain the heroin which is the subject of the motion to suppress. He also brought in from the glove compartment in the car a small white candle, a spoon, and a jar which proved to contain vitamin pills. These items were examined by the officers, and marked for identification.

Meanwhile, Dr. Sayre came into the waiting room and conversed with defendant, who was crying intermittently, and repeating his wife's name every so often. On Dr. Sayre's recommendation, because the hospital requested it, Green signed an application form for 72-hour detention for

---

[3] At the preliminary hearing Green testified that he said, "Can we go out into your car and get it?" and that the defendant said yes, nodding. When confronted with this inconsistency, Green stated, "I don't recall that or whether he replied like it says there, 'Yes,' or whether he replied the way I phrased it, 'No.'"

evaluation and treatment which recited the following circumstances: "His wife died of a possible over-dose of Herion [*sic*] at approx. 11:05 PM she was pronounced dead by Dr. Lombard Sayre Cloverdale. [¶] By his own admission he has just taken a shot of Herion [*sic*] just before the wife had. Also a small child involved (son). It is possible that he might poss. Attempt to take his own life. . . . [¶] As a result of my personal observations or facts called to my attention, I believe that said person is, as a result of mental disorder:

"YES    NO

[XX]    [  ] A danger to others

[XX]    [  ] A danger to himself

[  ·]    [  ] Gravely disabled."

The hospital records indicate that defendant was received at 12:50 a.m. after what the ambulance attendant testified was a 33.4-mile drive. He was admitted by the examining physician at 1:35 a.m. A deputy sheriff testified that he was sent to the hospital to interview the defendant, and first saw him in the emergency room. He read the defendant his *Miranda* rights from a card. The defendant nodded his head when the deputy asked him if he understood what he had said. Defendant answered, "Yes," when the deputy asked him if he understood that the deputy was a police officer. The deputy then informed him that he was going to be held on a manslaughter charge, and the defendant replied that he did not kill his wife and that he wanted an attorney. The conversation switched to what was to be done with the boy, and the defendant was polite, cooperative, and coherent in discussing the situation with respect to releasing the boy to friends. He gave the deputy his San Francisco address, the address of his parents in Michigan, and advised him that his wife had relatives living in Michigan also.

The defendant testified that he recalled having a conversation with a uniformed officer in the emergency room; that the officer informed him that he was being held on a charge of murder,[4] and that he responded that he had not killed his wife and that he wanted a lawyer. Defendant could not recall that the officer advised him of "all those things," but he did recall him saying that he had a right to a lawyer. Defendant could not recall discussing the boy's care, or the addresses of his relatives and the relatives of his wife.

Defendant equates the consent to search, as a waiver of his constitutional

[4]The hospital records contain instructions dated July 7, 1969 and signed in the name of Henshaw. The form is endorsed "Manslaughter Hold Narco User."

right to be secure against unreasonable searches and seizures (U.S. Const., amend. IV; Cal. Const., art. I, § 19), with a waiver of the privilege against self-incrimination as conferred by the Fifth Amendment and section 13 of article I of the state Constitution (see *Miranda v. Arizona* (1966) 384 U.S. 436, 475 [16 L.Ed.2d 694, 724, 86 S.Ct. 1602, 10 A.L.R.3d 974]), with a waiver of counsel (see *Johnson v. Zerbst* (1937) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]), with a waiver of a hearing before commitment as a "civil" narcotics addict under the provisions of the Welfare and Institutions Code (see *In re Walker* (1969) 71 Cal.2d 54, 57 [77 Cal.Rptr. 16, 453 P.2d 456]), and with the issues to be resolved in determining whether a confession is voluntary (see *Townsend v. Sain* (1963) 372 U.S. 293, 307 [9 L.Ed.2d 770, 782, 83 S.Ct. 745]; *Blackburn v. Alabama* (1960) 361 U.S. 199, 205-208 [4 L.Ed.2d 242, 247-249, 80 S.Ct. 274]; *People v. MacPherson* (1970) 2 Cal.3d 109, 113 [84 Cal.Rptr. 129, 465 P.2d 17]; and *In re Cameron* (1968) 68 Cal.2d 487, 498 [67 Cal.Rptr. 529, 439 P.2d 633]). The applicability of these precedents to the issue of whether there has been such consent as to make a search reasonable is discussed below. In this part of the opinion it is assumed that such standards should apply.

"It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." (*Johnson v. Zerbst, supra,* 304 U.S. at p. 464, fns. omitted [82 L.Ed. at p. 1466]. See also *In re Walker, supra,* 71 Cal.2d 54, 57.)

■ "A confession is involuntary unless it is 'the product of a rational intellect and a free will.' (*Blackburn v. Alabama* (1960) 361 U.S. 199, 208 [other citations omitted].) . . . If an accused's will is overborne because of impairment of his ability to exercise his rational intellect and free will, it is immaterial whether that impairment was caused by the police, third persons, the accused himself, or circumstances beyond anyone's control. [Citation.] Nor is it material that the officers pursued n improper purpose in eliciting the confession [citation] or that the facts related by the accused in such a confession are true [citation]. The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of free or rational choice. [Citation.] To determine this issue, the 'totality of circumstances' [citations] surrounding the interrogation must be considered." (*In re Cameron, supra,* 68 Cal.2d at p. 498. See also *Townsend v. Sain, supra,* 372 U.S. 293, 307-309 [9 L.Ed.2d 770, 782-783]; and *People v. MacPherson, supra,* 2 Cal.3d 109, 113-115.)

The rules to be applied in resolving the question of whether there was an intelligent waiver of defendant's rights are set forth in *People* v. *Stroud* (1969) 273 Cal.App.2d 670 [78 Cal.Rptr. 270], as follows: "Before analyzing the evidence, we are met with defendant's several questions concerning the rules governing a review of this character. First, he admonishes that this court must 'view the totality of the circumstances' in determining whether he knowingly and intelligently waived his right under the Fifth Amendment to remain silent. This guideline is correctly stated. [Citations.] Second, defendant advises that in looking at the totality of the circumstances it is the duty of a reviewing court to make 'an independent examination of the whole record.' We agree that this too, is correct. [Citations.]

"From these two rather broad guidelines, defendant appears to conclude that the reviewing court's examination of the record is a fact-finding process, that is, in making an independent examination of the whole record the reviewing court is free to reweigh the evidence in determining the totality of the circumstances. We find no authority for this proposition in any of the cases. The United States Supreme Court, in making an independent review of the record to ascertain the totality of circumstances surrounding the making of a confession, has consistently refrained from overturning a trial court's resolution of conflicting facts. . . . [¶] The California Supreme Court has formulated similar guidelines. [Citations.] ▇ Thus an appellate court viewing the totality of circumstances to ascertain whether a defendant's statements were voluntary and the product of a rational intellect, must accept the resolution of conflicting evidence by the trier of fact where the evidence upon which the lower court relied is not so improbable as to be entirely unworthy of belief. [Citations.]" (273 Cal.App.2d at pp. 674-676, *passim*. See also *People* v. *Carroll* (1970) 4 Cal.App.3d 52, 58 [84 Cal.Rptr. 60].) Similar rules govern a finding with respect to whether or not there has been a voluntary consent to a search. (See *People* v. *Linke* (1968) 265 Cal.App.2d 297, 311-312 [71 Cal.Rptr. 371].)

▇ The trial court was not obliged to accept the testimony of the defendant concerning his recollection and mental state at the time he conversed with the officers, nor was it required to accept the opinion of defendant's expert witnesses with respect to the defendant's mental condition at a time they did not observe him. The testimony of Dr. Sayre and the two officers present sustain the finding of the trial court. (See *In re Cameron, supra,* 68 Cal.2d 487, 499-500 [first interrogation]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 677-681 [78 Cal.Rptr. 270]; and *People* v. *Wright* (1969) 273 Cal.App.2d 325, 336 [78 Cal.Rptr. 75].)

In *Cameron* the court found on the evidence, which showed that the defendant was under the influence of Thorazine at the time he gave his second, third and fourth statements, that those statements were not the product of a rational intellect and a free will (68 Cal.2d at pp. 500-503). The court stated, "It thus appears from the overwhelming weight of the evidence that Cameron was substantially under the influence of Thorazine throughout the last three interrogations and that his will to resist was destroyed because he was rendered unable to comprehend the seriousness of his predicament or the significance to him of acceding step by step to 'remembering' the prosecution's reconstruction of his crime." (*Id.*, p. 502, fn. omitted)

In *Cameron* the court also noted, "Although the coherence, rationality, and responsiveness of Cameron's answers, which were relied upon by the referee, are material in determining the extent to which alcohol alone may have impaired his mental facilities, they shed no light on the effect of the Thorazine that was administered to Cameron before he made the last three statements." (*Id.*, p. 500. See also *Townsend* v. *Sain, supra,* 372 U.S. 293, 320, fn. 11 [9 L.Ed.2d 770, 790] and accompanying text; *Blackburn* v. *Alabama, supra,* 361 U.S. 199, 209 [4 L.Ed.2d 242, 249]; and *People* v. *MacPherson, supra,* 2 Cal.3d 109, 114.) In *MacPherson* the court noted, "We held in *In re Cameron, supra,* however, that the fact that a statement is coherent and rational is not controlling when other evidence establishes that it was not the product of a rational intellect and a free will. (68 Cal.2d at p. 497.)" (2 Cal.3d at p. 114.)

Defendant insists that the application of the foregoing principles to the facts of this case indicate that the trial court erroneously applied a " 'coherency' standard" (see *Townsend* v. *Sain, supra*) in determining that the defendant intelligently waived his rights. In *Cameron* the court was making its own finding with respect to the weight of the evidence and it accepted the opinion of the defense expert, which, as is pointed out in the opinion, was buttressed in many respects by the opinions of the other experts called by each side (see 68 Cal.2d at pp. 500-503). In this case this court is merely reviewing the record below which is neither so overwhelming, nor is it devoid of evidence to sustain the trial judge's conclusion. In *Townsend* v. *Sain* the case was remanded to permit a determination of whether the confession was brought about by administration of a drug having the effect of a "truth serum." (372 U.S. at p. 322 [9 L.Ed.2d at p. 791].) In *Blackburn* v. *Alabama* the court found, "In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed." (361 U.S. at p. 207 [4 L.Ed.2d at p. 248].) In *People* v. *MacPherson* the court noted, "Every medical expert who testi-

fied agreed that the defendant was schizophrenic and that he was probably irrational on the day he jammed the pencil into his eye . . . . The prosecution called no expert witnesses to testify that defendant was rational at that time." (2 Cal.3d at p. 114.)

It is concluded that the trial court's finding that the defendant intelligently waived his rights is sustained by sufficient evidence.

## II

■ In the foregoing discussion it is assumed that it was necessary for the prosecution to establish that the defendant's consent to search was the product of a rational mind. This premise fails to distinguish between the criteria which will render a search reasonable and which permit the officer to act on the facts as they would appear to a reasonable person in the position of the officer, and the criteria which render an accused's self-incriminatory statements inadmissible in a trial on the merits, under the precedents reviewed above, because they are not the product of a rational intellect and a free will.

It must be acknowledged that when the information or consent, upon which the reasonableness of a search is predicated, is obtained from the accused himself, the constitutional issues may involve the privilege against self-incrimination of the Fifth Amendment and perhaps the right to counsel of the Sixth Amendment, as well as the right to be secure against unreasonable searches and seizures of the Fourth Amendment. In *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], in which the exclusionary rule with respect to illegally seized evidence was applied to the states, the majority observed, "We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] . . . only after years of struggle,' *Bram* v. *United States,* 168 U.S. 532, 543-544 (1897). They express 'supplementing phases of the same constitutional purpose—to maintain inviolate large areas of personal privacy.' *Feldman* v. *United States,* 322 U.S. 487, 489-490 (1944). The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. *Rochin* v. *California,* 342 U.S. 165, 173 (1952)." (367 U.S. at pp. 656-657 [6 L.Ed.2d at p. 1091]. See also *People* v.

*Cahan* (1955) 44 Cal.2d 434, 448-449 [282 P.2d 905, 50 A.L.R.2d 513].)

The reasons supporting the Fourth Amendment exclusionary rule are: (1) "to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437, 1453]; and see *Mapp* v. *Ohio, supra,* 367 U.S. 643, 656 [6 L.Ed.2d 1081, 1090]; and *People* v. *Cahan, supra,* 44 Cal.2d 434, 445 and 447-448); and (2) "the imperative of judicial integrity" (*Elkins* v. *United States, supra,* 364 U.S. at p. 222 [4 L.Ed.2d at p. 1680]; and see *Mapp* v. *Ohio, supra,* 367 U.S. at p. 659 [6 L.Ed.2d at p. 1092]; and *People* v. *Cahan, supra,* 44 Cal.2d at pp. 445-446.) In the situation where the officers act reasonably on the evidence before them (here the ostensibly rational statements of the defendant, although he may subsequently be found to have been irrational), the exclusion of the evidence seized with his apparent consent will not prevent similar conduct in the future under similar conditions.[5] No deterrence is involved if the officers have acted in good faith on the facts as they appeared, because presumably they will be entitled to, and will, so act again in the future.

The imperative of judicial integrity cannot be decisive in these circumstances. It can merely categorize a result which must be founded on other criteria. If the search is valid because the officers acted reasonably the court need not be embarrassed in admitting the evidence. If, however, reasons of policy dictate that the evidence should be excluded to protect the right of privacy from what might otherwise be considered a reasonable invasion, integrity would require exclusion.

Despite the similarity of approach which has been noted above, it is generally recognized that the exclusionary rules under the Fourth and Fifth Amendments involve some different considerations.

In *United States* v. *Harris* (1971) 403 U.S. 573, 577 [29 L.Ed.2d 723, 730, 91 S.Ct. 2075] the court quoted from *United States* v. *Ventresca* (1965) 380 U.S. 102, 108 [13 L.Ed.2d 684, 689, 85 S.Ct. 741] as follows: " '[T]he Fourth Amendment's commands, like all constitutional require-

---

[5]The exclusion of the physical evidence should be distinguished from the exclusion of the incriminating statement. An uncoerced and voluntary statement secured in violation of the requirements of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], may nevertheless be used for impeachment. (*Harris* v. *New York* (1971) 401 U.S. 222, 225-226 [28 L.Ed.2d 1, 4-5, 91 S.Ct. 643].) When *Miranda* has apparently been satisfied it is conceivable that such a statement may be used to show probable cause for the search, and yet be excluded on the merits of the case because found to be involuntary on the basis of evidence not available to the officers when it was secured.

ments, are practical and not abstract.' " In *Hill* v. *California* (1971) 401 U.S. 797, 805 [28 L.Ed.2d 484, 490, 91 S.Ct. 1106], the court affirmed a decision of the Supreme Court of this state which upheld a search of the premises of the defendant which had taken place there in connection with the arrest of an occupant who mistakenly, but reasonably, was believed to be the accused. It stated, "When judged in accordance with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar* v. *United States*, 338 U.S. 160, 175 (1949), the arrest and subsequent search were reasonable and valid under the Fourth Amendment." (401 U.S. at pp. 804-805 [28 L.Ed.2d at p. 490].)

In *People* v. *Hill* (1968) 69 Cal.2d 550 [72 Cal.Rptr. 641, 446 P.2d 521], the Supreme Court of this state had recognized the rule in this state to be as follows: "Although sometimes criticized, the rule that a search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search has been regularly reaffirmed." (69 Cal.2d at p. 554. See also *People* v. *Smith* (1966) 63 Cal.2d 779, 799 [48 Cal. Rptr. 382, 409 P.2d 222] [cert. den. (1967) 388 U.S. 913 (18 L.Ed.2d 1353, 87 S.Ct. 2119), rehg. den. (1967) 389 U.S. 893 (19 L.Ed.2d 211, 87 S.Ct. 2119)]; *People* v. *Gorg* (1955) 45 Cal.2d 783 [291 P.2d 469]; *People* v. *Daniels* (1971) 16 Cal.App.3d 36, 44-45 [93 Cal.Rptr. 628]; *People* v. *Jackson* (1970) 14 Cal.App.3d 57, 68 [92 Cal.Rptr. 91]; *People* v. *Sullivan* (1969) 271 Cal.App.2d 531, 547 [77 Cal.Rptr. 25] [cert. den. (1969) 396 U.S. 973 (24 L.Ed.2d 441, 90 S.Ct. 463)]; and *People* v. *Linke, supra,* 265 Cal.App.2d 297, 315. Cf. *People* v. *McGrew* (1969) 1 Cal.3d 404, 412 [82 Cal.Rptr. 467, 462 P.2d 1] [cert. den. (1970) 398 U.S. 909 (26 L.Ed.2d 67, 90 S.Ct. 1689)]; and *People* v. *Hopper* (1969) 268 Cal.App.2d 774, 779 [75 Cal.Rptr. 253].) In *Hill* the state court concluded, "In summary, we hold that the reasonable but mistaken beliefs of the police did not render their conduct unreasonable in a constitutional sense. Mistake of identity does not negate probable cause to arrest, and a search based on a valid but mistaken arrest is not unreasonable as an unwarranted invasion of either the arrestee's or the defendant's privacy." (69 Cal.2d at p. 555.)

In *People* v. *Jackson* the court further pointed out, "In searches based on information from informants our courts have consistently held that it is the reasonableness of the officer's reliance on the information that is important rather than the ultimate validity of the information. [Citations.]" (14 Cal.App.3d at pp. 68-69.)

It may further be noted that in this state it is not necessary to

admonish the suspect, or occupant of property, as was in fact done in this case, that he has a right to refuse to consent to the search. (*People* v. *Stark* (1969) 275 Cal.App.2d 712, 714-715 [80 Cal.Rptr. 307], and cases collected. See also *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 275, fn. 8 [96 Cal.Rptr. 42, 486 P.2d 1242]; and see *People* v. *Superior Court* (1969) 71 Cal.2d 265, 270, fn. 7 [78 Cal.Rptr. 210, 455 P.2d 146]; but cf. *Cipres* v. *United States* (9th Cir. 1965) 343 F.2d 95, 97 [cert. den. (1966) 385 U.S. 826 (17 L.Ed.2d 62, 87 S.Ct. 58)].) It has also been noted that in the absence of fraud, ruse or subterfuge employed by the officers, the fact that the accused may have been under a subjective misapprehension as to the officer's intent will not invalidate his consent. (See *People* v. *Superior Court* (1969) 271 Cal.App.2d 524, 529 [76 Cal.Rptr. 518]; and *People* v. *Hale* (1968) 262 Cal.App.2d 780, 787 [69 Cal.Rptr. 28].)

The foregoing precedents indicate that an objective standard should be used in determining whether there has been a valid consent to search, even when that consent emanates from an accused who later establishes, upon facts not readily apparent to the officers, that he was not in full possession of his faculties at the time. This conclusion is supported by the fact that if the invalidity of the consent can only be established later, it is then generally too late to secure a search warrant or take such other steps as might have been taken to secure and seize the contraband, loot or evidence, had consent been refused. (See *People* v. *Stark, supra,* 275 Cal.App.2d 712, 715-716.) For example, in this case a search warrant was later secured, and undoubtedly could have been secured earlier on the statements of defendant as related by Dr. Sayre, if consent had been refused.

Defendant does not contend that any threats, coercion, promises or other improper conduct was engaged in by the police officers. He "does not dispute the testimony of Officers Waller and Green." He states, "It is clear that the *Miranda* warnings were technically given. It is clear that appellant gave apparent consent to the search." On these concessions the subsequent establishment that the defendant's statements were not knowingly, intelligently and voluntarily made because of the combination of the defendant's condition and his taking of alcohol and drugs should not affect the validity of the search and seizure made on the basis of the apparent consent, unless, as does not appear, the officers should have realized his condition.

### III

The People suggest that it is immaterial whether the defendant validly waived his *Miranda* rights or gave a rational consent, because the officers were entitled to investigate for emergency purposes. (See *People* v.

*Modesto* (1967) 66 Cal.2d 695, 706 [59 Cal.Rptr. 124, 427 P.2d 788] [cert. den. (1967) 389 U.S. 1009 (19 L.Ed.2d 608, 88 S.Ct. 574)]; and *People* v. *Paton* (1967) 255 Cal.App.2d 347, 356 [62 Cal.Rptr. 865].) It does appear that at the hearing Dr. Sayre testified, ". . . I discussed with them [the officers] my concern for finding the materials because I thought that was important from a toxicological standpoint." Neither of the officers advanced this as a reason for searching the car. Nor does it appear that any immediate test was made of the heroin either to determine the cause of the wife's death, or for the purpose of treating the defendant. It was not pressed at the hearing. That issue is therefore not reviewed on appeal.

## IV

■ Even if the consent were deemed to be vitiated, and the defendant's statements to the officers were disregarded because of the defendant's lack of understanding, the record discloses probable cause to search the car. The officers knew that the car did not belong to Dr. Sayre, and the only logical conclusion was that it was the vehicle which had gone by the gas station and brought the deceased and her husband and child to the doctor's office. The doctor told Officer Green that according to the admissions of the defendant he and his wife had been shooting heroin that evening. Although the defendant was not arrested at the time, there was reasonable cause to arrest him on the basis of the information received from the doctor, and this reasonable cause would suffice to give cause to search the car. (See *Chambers* v. *Maroney* (1970) 399 U.S. 42, 47 [26 L.Ed.2d 419, 426, 90 S.Ct. 1975]; *People* v. *Webb* (1967) 66 Cal.2d 107, 114-124 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708]; *People* v. *Taylor* (1969) 2 Cal.App.3d 979, 984 [83 Cal.Rptr. 119]; and *People* v. *McBride* (1969) 268 Cal.App.2d 824, 829-830 [74 Cal.Rptr. 375].)

In *Chambers* v. *Maroney, supra,* the court pointed out that given probable cause to believe that the vehicle contained articles which the officers were entitled to seize, ". . . if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search." (399 U.S. at p. 51, fn. omitted [26 L.Ed.2d at p. 428].) The court resolved this dilemma as follows: "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." (*Id.,* at p. 52 [26 L.Ed.2d at p. 428].)

So here the officers at the time the articles were secured from the car had the right to seize them. It would be a travesty of justice if their concern over the defendant's right to privacy which led them to seek his consent, would nullify an otherwise legal search and seizure because the consent subsequently proved inoperative for causes unknown to the officers, and unrelated to any action or inaction on their part. Nor should the subsequent election to impound the car (which otherwise might have been removed by defendant's acquaintances, or have been stolen), and to secure a search warrant for further search affect the right to search which the officers originally enjoyed at the doctor's office.

## V

The trial court refused to apply the plain sight rule because the heroin was in a closed container. In *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665], the court stated, "It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents. A search demands a search warrant." (69 Cal.2d at p. 59.) In *Marshall* the contraband was in cellophane-type bags that were in a closed brown paper bag that was in an open box in an open closet. The majority applied the foregoing rule despite the fact that the officers had reasonable cause to believe the bag they viewed contained contraband because an informer had told them that was the manner in which it was packaged, and because that conclusion was reinforced by their sense of smell.

As the three dissenting justices point out, ". . . it seems irrefutably clear that no prevailing law or precedent supports the majority position. Reason and common sense also dictate a contrary conclusion." (69 Cal.2d at p. 66.) It would, therefore, appear reasonable to limit the application of *Marshall* to its facts. Here Officer Waller approached the vehicle on the passenger's side which was toward the curb. The door was open on that side. He looked inside the vehicle through the open doorway and with his flashlight could see the open glove compartment from where he was standing outside the car. He observed "a box, square box, small one, white in color with a red rubber band around it, small candle, white in color a spoon and a jar, brand name jar of some type of pills. . . . It was lying there in plain sight." He realized that the spoon and the candle were used in taking heroin. He removed the foregoing articles, took them into Dr. Sayre's office and marked them for identification. The box was a small white box about 3 by 4 inches in size, of a type used for tablets or pills, and so far as the officer could recall, it bore no marking.

Technically the seizure of the small white box, which proved to contain heroin, falls within the prohibition of *Marshall*. Realistically it would be absurd to rule that an officer armed with knowledge that the persons who had recently vacated a vehicle had been shooting heroin, could seize the paraphernalia lying in plain sight but could not seize the containers adjacent to them. Under these circumstances the probability that one or the other containers contained contraband overwhelms the hope of privacy which was already abandoned by leaving the accompanying paraphernalia in plain sight. (See *People* v. *Terry* (1964) 61 Cal.2d 137, 151-153 [37 Cal.Rptr. 605, 390 P.2d 381] [cert. den. 379 U.S. 866 (13 L.Ed.2d 68, 85 S.Ct. 132)]; *People* v. *Simmons* (1971) 19 Cal.App.3d 960, 966-977 [97 Cal.Rptr. 283]; *People* v. *Green* (1965) 235 Cal.App.2d 506, 510-511 [45 Cal.Rptr. 371]; and *People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 27-28 [34 Cal.Rptr. 718].) Whether considered as a container of contraband or part of the paraphernalia used for shooting heroin, the box and jar were properly seized. (*People* v. *Nickles* (1971) 9 Cal.App.3d 986, 992-994 [83 Cal.Rptr. 763].) The fact that the jar subsequently proved to contain vitamins does not affect the validity of its seizure when found with the spoon and candle.

It is concluded for each and all of the foregoing reasons that the seizure of the articles from the glove compartment of defendant's vehicle did not offend the constitutional provisions against unreasonable searches and seizures. The motion to suppress was properly denied. The tragic circumstances which lead to the filing of these charges should not obscure the realities of the situation faced by the officers who were responsible for the seizure. The record reveals that in granting probation the trial court recognized that some consequences furnish greater penalties than the law can impose. The rigors of the law were tempered accordingly.

The order of judgment and probation is affirmed.

Molinari, P. J., and Elkington, J., concurred.