COMMONWEALTH *vs.* CHERYL A. GARREFFI.

Hampshire.    January 6, 1969. — March 7, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL,
& REARDON, JJ.

*Search and Seizure.    Evidence*, Relevancy and materiality.    *Burglarious
Instruments.*

At the trial of an indictment for possession of burglarious instruments,
evidence that one night a police officer found the defendant in the
driver's seat of an automobile parked near a dairy and observed a
"walkie-talkie" unit on the floor beside her, that, when she failed to
give a satisfactory account of herself, the officer asked if he could con-
duct a search and "if she would mind" if he "looked into the car" and
she replied "no, she would not mind" and unlocked the door on the
right hand side, and that she complied with his request for permission
to look for the automobile registration, warranted a conclusion that
the defendant consented to the officer's search of the automobile upon
entering it and to a search of it a short time later after the defendant had
apparently abandoned it, and there was no error in admitting in evi-
dence articles seized in the automobile, including articles in its glove
compartment, during the searches [431, 432]; the defendant's consent
to the searches without a warrant was not "destroyed" by a failure to
give her the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436,
since she was not then in custody or the focus of any criminal investi-
gation [431–432].
At the trial of an indictment for possession of burglarious instruments
against a defendant found at night in an automobile parked a few
hundred feet from a dairy and containing a "pretty complete set of safe
cracker's tools," there was no abuse of discretion in the admission of
evidence that an interior door on the second floor of the dairy had been
"jimmied," that there were "scuff marks" on the floor and window,
and that a safe lying on the roof of the garage "obviously . . . had
been pushed over and landed" there.    [432]
Evidence warranted conviction upon an indictment for possession of
burglarious instruments against a defendant found at night in an
automobile containing a "pretty complete set of safe cracker's tools"
and parked near a dairy where an attempt had been made to remove a
safe.    [432–433]

INDICTMENT found and returned in the Superior Court on
June 6, 1968.

The case was tried before *Tisdale,* J.

*Raymond R. Cross*, Assistant District Attorney, for the Commonwealth.

*John M. Fitzgerald* for the defendant.

SPIEGEL, J.   The defendant was tried on an indictment charging her with possession of burglarious tools.   G. L. c. 266, § 49.   The jury returned a verdict of guilty and the case is here by appeal under the provisions of G. L. c. 278, §§ 33A–33G.

1. The defendant filed twelve assignments of error.   They involve the introduction of evidence with regard to items allegedly seized in violation of the defendant's constitutional rights and the admission in evidence of certain testimony.   One of these assignments also deals with the denial of the defendant's motion for a directed verdict.   The only witness who testified regarding the search which resulted in the seizure of the items was a police officer, one Dubuc. We summarize his testimony.

At approximately eleven o'clock at night on June 11, 1966, Dubuc was detailed to investigate a complaint by one Ducharme of 58 Camden Street, South Hadley.   As he proceeded down Camden Street in his patrol car he observed an automobile parked just beyond 58 Camden Street, about 400 to 500 feet from the All Star Dairy.   He parked the patrol car.   As he approached the automobile on foot, he noticed the defendant sitting in the driver's seat of the automobile.   He observed that "[s]he leaned over in the seat . . . [o]ut of sight," and then reappeared.   When he reached the car he asked the defendant what she was doing.   She replied that she had been picked up in Springfield by one Jim Carmen and he had driven to that location.   In response to additional questions she stated that Carmen was visiting a friend in one of the nearby houses and that she had not noticed which way he had gone.   Dubuc then requested some identification.   The defendant gave him her Massachusetts operator's license.

During this conversation Dubuc observed a "walkie-talkie" unit on the floor of the passenger side of the front of the car.   The defendant stated that she did not know

what the "walkie-talkie" unit was for and that the automobile belonged to Jim Carmen. Dubuc warned her that if she "did not come up with some better answer" he was going to arrest her "for being abroad in the nighttime without giving a good account of herself." He then asked her if he could conduct a search and "if she would mind" if he "looked into the car."[1] "She said no, she would not mind and she unlocked the door on the righthand side."

Immediately upon entering the car, Dubuc checked the registration sticker attached to the windshield and discovered that it did not match the number plates then attached to the automobile. He also saw another "walkie-talkie" unit and a small flashlight on the floor of the car. The unit's microphone was out of its pocket; its antenna was extended and the unit was turned on. When he examined the contents of the glove compartment, he found a key ring with several keys. The keys were either vending machine or alarm system keys. Attached to the key ring were two tags that read "Platform Vendor" and "Tville Vendor." There was also a wallet and an operator's license in the name of Lawrence F. Dionne. The defendant denied knowing Dionne.

In the interim a second officer had arrived on the scene in response to a call by Dubuc for assistance. While the second officer talked with the defendant, Dubuc took the keys he had found in the glove compartment and "checked" the nearby buildings. Two doors of the All Star Dairy were unlocked. Neither door appeared to have been "forced." He then called the station house and was told that it was not unusual for doors at the dairy to be unlocked. He then went to the station house to compare the keys he had taken from the glove compartment with others that were at the station house. Before he left the scene, arrangements were made to enable the defendant to get home.

---

[1] In response to a question by the judge during cross-examination, Dubuc said that "I asked her permission to get — to look into the car." When asked by the judge whether he had "ask[ed] her if you could look in the glove compartment," he answered, "I asked her if it would be O.K. if I could find the registration."

Dubuc returned to Camden Street fifteen or twenty minutes later. During his absence the defendant had left in a taxi. She did not take the ignition keys of the automobile with her. Dubuc proceeded to reëxamine the contents of the glove compartment. He found a registration certificate for the automobile in the defendant's name. The number on the certificate matched that appearing on the registration sticker. Under the rear floor mat of the automobile, he found the number plates that matched both the registration certificate and sticker. The back seat of the car was removed to gain entrance to the trunk. There Dubuc found a cloth bag that contained the following: a pry bar, a gas mask, a "light switch" to convert a bulb socket to a plug outlet, a fifty foot, heavy duty extension cord, a power drill, eight drills capable of penetrating metal, wire cutters, a lead sledge hammer, three punches, a metal rod bar, a hole cutting tool and six concrete drills. At no time was a search warrant obtained, nor was the defendant given any of the warnings required by *Miranda* v. *Arizona*, 384 U. S. 436.

We believe that the judge was justified in concluding that the defendant "consented" to the initial search of the automobile. The defendant had a legal obligation to produce the registration certificate. See G. L. c. 90, § 25. We do not think that her compliance with the officer's request for permission to look for the certificate was coerced. See *Commonwealth* v. *Campbell*, 352 Mass. 387, 401; *Wren* v. *United States*, 352 F. 2d 617 (10th Cir.). In order to conduct that search it was reasonable for Dubuc to enter the automobile. The number on the registration sticker, the "walkie-talkie" units and the flashlight were then in plain view. The keys and the operator's license were in plain view within the glove compartment. We believe that the officer's observation of these items did not constitute a separate search or an extension of the permitted search beyond the limitations of the defendant's consent. *Commonwealth* v. *Laudate*, 345 Mass. 169.

The defendant contends that the failure to give her the *Miranda* warnings "destroys" her consent. In support

of her contention she directs our attention to only one case, *California* v. *Stewart,* a companion case decided with the *Miranda* case. That case bears little similarity to the present one for there Stewart had been arrested before the arresting officers asked his permission to conduct a search. The Supreme Court of the United States, in reversing his conviction, did not refer to the use of evidence seized during the search, but rather to the introduction of a confession obtained following five days of in custody interrogation. *Miranda* v. *Arizona,* 384 U. S. 436, 497. In the instant case the defendant was not in custody and an investigation had not focused on her. *Escobedo* v. *Illinois,* 378 U. S. 478. She was merely subjected to a "threshold inquiry." *Commonwealth* v. *Lehan,* 347 Mass. 197, 201–202. *Terry* v. *Ohio,* 392 U. S. 1.

We do not believe that the consent of the defendant to the search of the automobile was so limited as to prevent the police officers from making an additional search after the defendant had apparently abandoned the automobile. There was no error in introducing evidence of the items seized from the defendant's automobile.

2. The defendant also contends that the testimony of another police officer should have been excluded. The officer testified that on the morning of June 12, 1966, he examined the premises of the All Star Dairy and discovered that an interior door on the second floor of the dairy had been "jimmied." There were "scuff marks" on the floor showing that the "safe had been dragged . . . across the floor. There were also scuff marks on the window . . . and . . . there was a safe laying . . . [on the] roof to the garage. Obviously . . . [the safe] had been pushed over and landed on the roof." Prior to the introduction of this testimony, the instruments found in the defendant's automobile had been identified as a "pretty complete set of safe cracker's tools." Considering the proximity of the defendant's automobile to the dairy, we do not think that the judge abused his discretion in admitting this evidence.

3. Finally the defendant contends that the evidence was

insufficient and therefore it was error not to grant her motion for a directed verdict. We do not agree. The defendant was found in a parked automobile containing a "pretty complete set of safe cracker's tools" in the proximity of a business where an attempt had been made to remove a safe.

*Judgment affirmed.*