STATE of Maine

v.

Theresa **KOUCOULES.**

Supreme Judicial Court of Maine.

Dec. 11, 1974.

John Atwood, Vernon I. Arey, Asst. Attys. Gen., Augusta, for plaintiff.

Berman, Berman & Simmons, P. A., by Jack H. Simmons, Lewiston, Powers Bradford & Palmer, by Carl O. Bradford, Freeport, for defendant.

DUFRESNE, Chief Justice.

Theresa Koucoules, the defendant below, pursuant to Rule 41(e), M.R.Crim.P., filed in the Superior Court a pre-trial motion to suppress for use at trial certain evidence of the State which she contends was obtained by an unlawful search and seizure. The Justice who heard the motion granted only partial relief. Aggrieved by the partial denial of her motion, the defendant, pursuant to Rule 37A(b), M.R.Crim.P., moved that the interlocutory ruling be reported to the Law Court for determination before any further proceedings be taken in the action. The presiding Justice did report the matter as requested. The State, with the written approval of the Attorney General, seasonably countered with a motion "that an order issue allowing it to cross-appeal." See, 15 M.R.S.A., § 2115–

A. The Justice granted the State's motion. Both appeals are properly before us.

The reference motion to suppress was filed after the Grand Jury for the County of Cumberland, on May 8, 1973, had indicted the defendant for unlawful homicide punishable as murder in the death of her husband, George Koucoules, on or about October 1, 1972. We summarize the evidence necessary to a proper consideration of the legal propriety of the rulings on the motion to suppress, intimating no opinion as to the true state of events leading up to the victim's death, nor as to the defendant's criminal responsibility therefor.

The defendant testified that at approximately 5:00 a. m. on October 1, 1972 she went to a neighbor's home for help, because there was "something wrong" with her husband. She did not know exactly what was wrong with Mr. Koucoules, but had found him cold and bloody, and was unable to wake him. After telephoning the police, the neighbor returned with the defendant to the Koucoules residence. There, in the bedroom, he observed the dead body of Mr. Koucoules.

The first officer to arrive at the scene was Sergeant Vermette of the Brunswick Police. He testified that he arrived at 5:02 a. m., whereupon he was directed into the bedroom by the neighbor, Mr. Berube. He observed what appeared to be a bullet wound in the head of the victim and, upon feeling the body for warmness, concluded that the defendant's husband was dead.

The Medical Examiner, Captain Joy and Chief Favreau of the Brunswick Police were summoned to the scene. Within minutes, Officers Thomason and Fournier of the Brunswick Police Department arrived. Sergeant Vermette, who was Mrs. Koucoules' cousin, then directed Officer Fournier to remain with Mrs. Koucoules to make sure she would be all right. He also instructed one of the other officers to call Mrs. Koucoules' physician. Dr. Bachrach responded to the call and remained at the scene for some thirty-five to forty-five minutes, departing between 5:45 and 6:00 a. m.

Members of the State Police homicide unit began to arrive at approximately 7:00 a. m., Detective Greely being the first to appear. Detective Manduca of the State Police arrived at approximately 8:30 a. m. Detective Manduca testified that he specialized in firearms identification, photography, and "checking for preservation of evidence." It appears from the record before us that he and Sergeant Lessard of the State Police were the officers principally responsible for processing the scene, in this case, the bedroom in which the body was found, and gathering what evidence appeared material and relevant in connection with the homicide. From his observations of the deceased, Detective Manduca made a preliminary determination that the bullet wound was caused by a .22 caliber weapon. A .25 caliber pistol and bullet clip were found in the top bureau drawer, but there was no sign of any .22 caliber weapon in the bedroom. On the floor Detective Manduca found part of a spent bullet and, following the removal of the body at approximately 9:30 a. m., he came upon a cartridge case between the mattress and headboard of the bed. Prior thereto, other evidence had been seized from the bedroom, but, for present purposes, it is unnecessary to itemize the various articles found.[1]

The evidence in this record would indicate that the defendant left the residence in the company of relatives sometime between 9:30 and 10:30 a. m. The State contends that, before leaving, Mrs. Koucoules gave the police permission to search the house. The circumstances surrounding the alleged consent will be touched upon in

---

[1.] It is also unnecessary to consider the admissibility of a spent bullet taken from the body of the deceased during the course of the autopsy. The defendant has expressly waived objection to any evidence seized from the corpse itself.

greater detail when the legality of the search is considered.

The officers had been informed by the defendant and by her son that Mr. Koucoules kept several guns in the house, one of which was a .22 caliber handgun. They intensified their efforts to find the missing weapon after the defendant had gone. Chief Favreau in his search for the gun entered an upstairs bedroom and observed a partially opened closet door. Inside the closet he observed an opening in the ceiling which led to a superadjacent attic crawl space. He summoned Sergeant Dionne and "boosted him up" into the crawl space. The opening was partially covered by a piece of "press board" which Dionne apparently moved aside to allow entrance into the space above. There, he saw a quantity of insulation, a small cardboard box, and a holster containing a .22 caliber pistol. He passed the gun down to Chief Favreau, while he himself climbed further into the crawl space in search of a bullet clip for the weapon. At this point one of the State Police officers stated that the weapon should be returned to the attic for the purpose of photographing it in its original location. Sergeant Dionne then replaced the gun and went downstairs with the other officers.

There was then some discussion concerning the matter of a search warrant, and one of the State Police officers telephoned the Attorney General's Office. As a result of the ensuing conversation, the officers decided that a search warrant would be sought. The time was then approximately eleven in the forenoon.

Detective Greely then left to obtain a warrant, accompanied by Captain Joy of the Brunswick Police. The record contains conflicting estimates as to the time at which they returned with the search warrant, the earliest being 1:00 p. m., and the latest being approximately 4:10 p. m. During their absence the remaining officers had maintained control over the premises, although it does not appear that any further search was conducted at that time. When they did return with the warrant, the search was resumed. Detective Manduca returned to the crawl space and took possession of the weapon after photographing it. At the same time, he seized a sample of the insulation earlier observed by Sergeant Dionne, the crawl space cover, and a small ladder on which there was an unidentified stain.[2] Thereafter, the officers continued unsuccessfully to search for a bullet clip for the weapon, and for a money bag in which Mr. Koucoules reportedly had placed the receipts from his restaurant business. By 6:30 p. m., all officers had departed from the scene.

At the conclusion of the hearing on the motion to suppress, the presiding Justice recited his combined findings of fact and conclusions of law in extended detail. He treated the search as a warrantless one, because the significant part of the search had been done without a warrant and also because the warrant itself had been obtained upon an affidavit which, by not disclosing the previous search for, and discovery of, the gun, gave a false impression to the complaint justice and amounted to a fraud upon a judicial officer.[3]

---

2. There is some suggestion in the record that the stain consisted of "red spots" which may have been blood.

3. In view of this finding, the presiding Justice expressed no opinion concerning other issues raised by the defendant, such as the sufficiency of the affidavit and the jurisdictional power of the complaint justice to issue the warrant.

 In concluding that the warrant was fraudulently obtained, the Justice below described the supporting affidavit as "inaccurate," although "not containing any false statements." The "inaccuracy" referred to was the fact the supporting affidavit failed to mention that, as a result of the preceding search, the .22 handgun had already been located. The Justice found that this omission was "by design," although he did not specifically attribute to the officers any *fraudulent* purpose. He did state that the documents were "designed to make it appear that what had occurred had not occurred and that any search and

Nevertheless, the Justice found applicable two exceptions to the warrant requirement, subject to certain limitations. He applied this Court's decision in *State v. Chapman*, 1969, Me., 250 A.2d 203 (dealing with the right and duty of police officers to "process the scene" of a homicide), to uphold the seizure of all items except for the ladder, insulation, and crawl space cover. In support of this ruling, the Justice viewed *Chapman* as sanctioning a "reasonably limited search, a search necessary to accomplish the immediate purposes of the officers," and not "a license to forever after [sic] rummage through the personal effects of the household which is being

searched . . . ." He further reasoned that the .22 caliber pistol had been "seized" when Sergeant Dionne first found it, even though it had been replaced and later "found" again, and he concluded that at that time the officers were still acting reasonably within the time limits which he construed *Chapman* to impose. He ruled, however, that the items ordered suppressed had not earlier been seized and in fact had not been seized until "some four and a half or five hours later," at which time, so he concluded, the *Chapman* justification had expired.

The Justice also circumscribed the consent search exception with similar limita-

seizure taking place [thereafter] was pursuant to appropriate court process." Standing alone, such language suggests a finding of fraudulent intent. However, other language used by the Justice negates this suggestion. Elsewhere in his findings, he states that the officers acted "*either* through ignorance *or* through malice." (Emphasis added).

In view of such ambiguity, and since we are disposing of the case on another ground, we find no need to pass upon the issues left unresolved by the trial Justice nor to discuss at length on this occasion to what extent a warrant may be vitiated by omissions or misrepresentations in supporting affidavits.

We do note, however, that the matter has been the subject of recent attention in other courts. In *Krauss v. Superior Court*, 1971, 5 Cal.3d 418, 96 Cal.Rptr. 455, 487 P.2d 1023, the officer obtaining a warrant to search a motel room for drugs failed to mention in his affidavit the fact that he personally had already entered the room without a warrant and had seen the evidence for which a warrant was sought. The majority opinion upholding the warrant apparently found the omission harmless, since there is no discussion of the issue. The dissenting opinion only briefly alludes to the issue of "concealing" evidence bearing so directly on probable cause, and no authorities are cited in the discussion of the point.

A more thorough treatment of the issue of *misrepresentations* may be found in *United States v. Thomas*, 1973, 5 Cir., 489 F.2d 664; *United States v. Carmichael*, 1973, 7 Cir., 489 F.2d 983; and *United States v. Marihart*, 1974, 8 Cir., 492 F.2d 897, petition for cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51.

The Fifth Circuit in *Thomas* stated the rule to be that the warrant will be held invalid if (1) the error was committed with the in-

tention to deceive the magistrate, even if immaterial to the issue of probable cause; or (2) the error was unintentional, but material to the establishment of probable cause. The Seventh and Eighth Circuits adopt the view that a misrepresentation must be either recklessly or intentionally untrue, but if merely reckless, it must also be material; and if there is deliberate perjury, the warrant will be held invalid, even if the misrepresentation was immaterial. The difference between the two views is that the latter would tolerate an innocent misrepresentation, even if material. Neither test purports to deal with the question of *omissions* as opposed to misrepresentations.

In *United States v. Wolfe*, 375 F.Supp. 949, [E.D.Pa. 1974] the Court considered an omission as within the meaning of the word "error" in *Thomas*, supra, for analytical purposes. In *Wolfe*, the Court reviewed an affidavit in which the affiant failed to disclose certain information which might arguably have exculpated the defendant. Sustaining the affidavit and warrant, the Court found that there was no wilful falsification nor any intent to deceive the magistrate. The Court also stated that the preparation of an affidavit is necessarily a selective process which ordinarily does not contemplate the inclusion of everything that transpired.

In the present case the error was of the latter variety, *i. e.* an omission rather than a perjurious misrepresentation. Technically, the finding of fraud would be unsupported and erroneous, absent an additional finding that the omission was made, not merely through "ignorance or malice," but with the specific intent to deceive. We need not speculate as to what the Justice would find on that specific question, since the case may be resolved without resort to the sufficiency of the warrant.

tions. He found from the preponderance of the evidence that Mrs. Koucoules did give a valid consent to a search of the premises. This consent, he held, encompassed the bedroom in which the body was found, as well as the upstairs area, including the attic crawl space, and would suffice to authorize the seizure of all items taken, excepting, however, the ladder, insulation, and crawl space cover.

We quote the Justice's reasoning which led him to suppress the items specified:

"However, again, it seems to me that consent to search is not a wide open consent which means that officers are free at will to forever rummage through the personal property of the individual who has consented. I think it is a consent to a reasonable and limited search. It is a consent to one search. [sic] Not a consent to a series of searches and, therefore, again, I conclude that the other three items seized on the afternoon, that is, the ladder, the insulation and the cover of the crawl space should be suppressed . . . ."

Since, in our view, the Justice below imposed unwarranted limitations on the right of police officers to conduct a search with the express consent of the person in control of a dwelling, we must reverse the decision he reached to the extent that the unwarranted limitations resulted in the suppression of evidence.

## LIMITATIONS ON CONSENT SEARCHES

■ Initially, we may note that any search, including a consent search, implies some exploratory investigation. See, *State v. MacKenzie*, 1965, 161 Me. 123, 137, 210 A.2d 24, 32. We further recognize that a search conducted pursuant to a valid consent is constitutionally permissible and is an established exception to the requirements of both a warrant and probable cause mandated by the Fourth and Fourteenth Amendments. *Schneckloth v. Bus-*

*tamonte*, 1973, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Vale v. Louisiana*, 1970, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L. Ed.2d 409; *Katz v. United States*, 1967, 389 U.S. 347, 358, 88 S.Ct. 507, 515, 19 L. Ed.2d 576; *Papolas v. State*, 1967, Me., 235 A.2d 533; *State v. Littlefield*, 1965, 161 Me. 415, 213 A.2d 431.

■ A valid consent to a search is a waiver of the necessity for a search warrant based upon probable cause as constitutionally guaranteed, and the existence of a valid consent to the search or of the waiver of the constitutional privilege is a factual issue, the establishment of which rests upon the State. *State v. Smith*, 1968, 72 Wash.2d 479, 434 P.2d 5.

The burden of establishing the legal sufficiency of a consent is on the government, and its existence and voluntariness is a question of fact. *Maxwell v. Stephens*, 1965, 8 Cir., 348 F.2d 325.

■ What constitutes a valid waiver or consent under the Fourth-Fourteenth Amendments is determined by the particular circumstances surrounding the consent in each case. *People v. Kaigler*, 1962, 368 Mich. 281, 118 N.W.2d 406. Each case must stand or fall on its own special facts. *State v. Sneed*, 1966, 76 N.M. 349, 414 P.2d 858.

■ Consent can legitimize what would otherwise be an illegal and unreasonable search. From this premise flows the rule which governs this case, that a consent search is reasonable and legal to the extent the individual has consented. Thus, the scope of a consent search is limited by the bounds, and determined by the breadth, of the actual consent itself. The requirement of a warrant is waived only to the extent granted by the defendant in his consent. *United States v. Dichiarinte*, 1971, 7 Cir., 445 F.2d 126; *United States v. DeMarsh*, 1973, E.D.Wis., 360 F.Supp. 132, 136, n. 3; *People v. Superior Court for County of Los Angeles*, 1970, 10 Cal. App.3d 122, 127, 89 Cal.Rptr. 316, 319.

■ What, if any, limitations may attach to any given consent to search, when limitations are sought to be implied from the language used or the conduct displayed, must be the result of an act of judgment, on the part of the police authorities to whom consent was given, formed in the light of the particular situation and with account taken of all the circumstances, an act of judgment warranting a man of reasonable caution in the belief that some limitation was intended by the consent giver.

■ Thus, the factual circumstances, under which a consent to search is given, might convey to the reasonably cautious officer impliedly intended qualifications restricting the search as to object, area, duration, method of execution or that the consenting party insists on being present when the search is conducted. Where, however, the evidentiary situation indicates a broad consent, devoid of any such limiting factors when viewed by reasonable persons under all the existing circumstances, then the officers are not bound by some abstract rule of reasonableness applicable to all consent searches totally unrelated to any factual limitative inferences which may be inherent in the consent itself.

We are not dealing in the instant case with a search of locked areas pursuant to a general consent to search the house, such as locked drawers, closets or safes, as to which we intimate no opinion. We further note that a general consent to search the house would not factually sanction as a matter of law the tearing down of walls in the manner and to the extent disapproved in *Buckley v. Beaulieu*, 1908, 104 Me. 56, 71 A. 70, 22 L.R.A.,N.S., 819.

In *Lamb v. State*, 1973, Nev., 516 P.2d 1405, the defendant readily admitted the

police into his home and was asked if they could "look around." He responded that they could look anywhere they wanted and the Court held that this response was a consent to a general search, since the permission given was general and unlimited.

In *State v. Rye*, 1970, 2 Wash.App. 920, 471 P.2d 96, the Court also found a general consent, where the defendant's wife stated that, if the police believed there was stolen property in the house, they could "go ahead and find it."

*State v. Johnson*, 1967, 71 Wash.2d 239, 427 P.2d 705, serves to illustrate both sides of the issue. In that case, the police conducted three searches of a vehicle which resulted in the seizure of more than $200 in change alleged to have been stolen from parking meters. The first search was held invalid as not incident to a lawful arrest. The second search was ruled partially valid on the basis of consent, but, because the consent was limited to the trunk of the vehicle, evidence seized from the passenger compartment was suppressed. In connection with the third one, the police had asked a co-defendant for permission to search the entire car and he responded, "Be my guest." This consent, general and unqualified, was held to authorize a thorough and complete search of the vehicle.

The question to be answered in each case is, whether the police activity transcends the actual scope of the consent given. If it does not, the police are acting lawfully and the fruits of such lawful action should not be suppressed. *Commonwealth v. Garreffi*, 1969, 355 Mass. 428, 245 N.E.2d 442.

The party consenting may restrict the scope of his consent and thereby limit the search. *United States v. Dichiarinte, supra.*[4]

4. There is authority to the effect, once consent has been granted voluntarily to conduct a search, that consent cannot be withdrawn. *People v. Kennard,* 1971, 175 Colo. 479, 488 P.2d 563. At least, subsequent revocation would not taint the fruits of the search obtained prior to the rescission. See, *United States v. Young,* 1972, 7 Cir., 471 F.2d 109. This Court, in *State v. Brochu,* 1967, Me., 237 A.2d 418, ruled that a search conducted on one day with the defendant's cooperative consent in assisting in the solution of his

## LIMITATIONS BASED ON OBJECT

■ Where permission has been given to search for a particular object, the ensuing search remains valid as long as its scope is consistent with an effort to locate that object. Furthermore, other evidence observed in the course of such a lawful search may also be seized. *People v. Stewart,* 1973, 10 Ill.App.3d 187, 293 N.E. 2d 169; see, *State v. Custer,* 1971, Fla. App., 251 So.2d 287.

■ Conversely, a search wherein the actions of the officers exceed the bounds of the actual consent becomes an invidious invasion of privacy rendering the search unreasonable within the meaning of the Fourth Amendment and the fruits thereof must be suppressed. *United States v. Dichiarinte,* supra; *People v. Superior Court for County of Los Angeles,* supra.

## LIMITATIONS BASED ON PRESENCE

■ In defining the scope of the search, the consenting party may impose limitations on the right of the police to search, as, for example, he may consent to a search on condition he be allowed to be present while it is being conducted. *Herron v. State,* 1970, 3 Tenn.Cr.App. 39, 456 S.W.2d 873 (modified as to death penalty, 408 U.S. 937, 92 S.Ct. 2865, 33 L.Ed.2d 756). Conditions thus imposed, however, may subsequently be waived and, if so, the search may continue in the absence of the consenting party. *Herron v. State,* supra. See also, *Commonwealth v. Garreffi,* supra.

A consent search is a limited and conditional search only insofar as the consenting party has expressly stated, or, under the

reasonable man standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches.

In the present case, the words used by the presiding Justice indicate that he viewed all consent searches as being generally limited in scope. He stated that "consent to search is not a wide open consent which means that officers are free at will to forever rummage through the personal property of the individual who has consented. I think *it is a consent to a reasonable and a limited search. It is a consent to one search. Not a consent to a series of searches . . .*" (Emphasis added.) From this language it is apparent that the Justice was not attempting specifically to characterize Mrs. Koucoules' alleged consent. It does not appear his ruling was that she in fact had given only a limited consent or that her consent had been revoked. His decision seems to have been made quite apart from any consideration of the actual limits, if any, which she herself may have imposed. But, as we have noted above, a given consent *may* be general and, absent limitations or conditions, express or implied, the police are *not* confined to conducting only a "reasonable and limited search."

■ It is true, as stated by the Justice below, that consent to search does not ordinarily last forever. "When consent is given to search an area, it does not mean the constitutional protection against unreasonable searches and seizures has been waived forever." *People v. Chism,* 1971, 32 Mich.App. 610, 189 N.W.2d 435, affd., 390

---

wife's death could not be measured on the next day by his original consent, where the defendant, prior to the officers' second-day search, had been arrested for the murder of his wife. The change of status automatically put an end to the defendant's previous consent. We need not, however, decide in the instant case the revocability vel non of a consent to search originally voluntarily given.

Mich. 104, 211 N.W.2d 193; see, *State v. Brochu,* supra. It is also true that a consent which itself limits the officers to one search will not suffice to sustain a second search. *Pinizzotto v. Superior Court,* 1968, 257 Cal.App.2d 582, 65 Cal.Rptr. 74.

The question at issue is not, whether the search in the instant case was one of the forever lasting variety, nor whether we are dealing with successive independent searches instead of one continuous search, but rather, whether the police activity in searching Mrs. Koucoules' home exceeded the scope of the permission which she had given the officers.

## LIMITATIONS BASED ON AREA OR SPACE

█ We note initially, the presiding Justice found as a fact that the consent given extended throughout the house and, specifically, to the area from which the items sought to be suppressed were taken. This finding is abundantly supported by the record. According to the several witnesses who testified as to the circumstances surrounding the consent, the defendant gave a general consent and there was no discussion as to any limitations thereon. One witness testified that the defendant had been assisting the police in their search for the missing .22 caliber pistol and that, immediately prior to her departure, she was asked by Captain Joy: "Is it all right if we search the rest of the house for the gun?" The witness quoted the defendant as responding: "Sure, go ahead, Larry, search for anything you want. I hope you find it." Another witness quoted the defendant as follows: "Larry, you can look anywhere in the house that you want to and I hope you can find what you want."

"Larry" is Captain Lawrence Joy, and he testified that:

"I asked Mrs. Koucoules, I told her that it seemed that he was shot at the time and I would like to know if I could search for any guns within the house and she advised me to go ahead. She would like to get this cleaned up and that's all she said."

He further testified that he and the defendant had no discussion as to any limitations on the area to be searched, and that "it was general."

On direct examination Chief Favreau remembered overhearing a conversation in which Captain Joy asked Mrs. Koucoules, if she had any objections to a search of the upstairs area. According to the witness, she responded: "No, go right ahead and look." He also testified as to another conversation between Captain Joy and the defendant which occurred just before the defendant left the house and while she herself was assisting in the search for the gun. In this conversation, after stating that she did not know where "it" was, the defendant allegedly said: "Look wherever you want. I don't know where it is."

On cross-examination, Chief Favreau admitted that he was not certain whether the earlier conversation had actually mentioned "upstairs" or "downstairs," but he was sure that the request had been for permission to search "the house," although he acknowledged the possibility that the request may have limited the objective of the search to a search "for guns." When asked whether he remembered Mrs. Koucoules confining her consent only to the cellar, as opposed to "any place," he testified:

"A. No, it was a general _ _ _ there was no area. Just a general look.

"Q. Do you remember the exact words spoken?

"A. It was something like 'Larry, look wherever you have to' or something of this type. The exact words, I cannot say the exact words."

In her attempt to show that the only consent given was a limited one, the defendant emphasizes certain testimony given

by Captain Joy, where he was describing a second consent conversation between himself and Mrs. Koucoules following their mutually unsuccessful efforts to find the missing weapon.

His testimony was as follows:

"A. Well, I had advised Mrs. Koucoules that we still were unable to find a .22 that belonged to her husband. She said 'well, didn't you find it in the bureau drawer?' I said, 'no, I didn't,['] so she took the drawers all apart with me and we went through the drawers one by one taking them out of the bureau and going through the drawers and nothing turned up. We didn't find the .22 and she advised me just before leaving that Sonny [Mr. Koucoules] had some things in the cellar that he took hunting with him and the .22 usually went hunting with him when he did go. He used to carry this, it might be there. She told me to look for a small black bag. After she left I did go down to the cellar and found the black bag with the .22 ammunition in the bag but still no .22. . . ."

The following testimony consists of an excerpt from defense counsel's cross-examination of the witness, and an answer in response to a question from the Court:

"Q [by defense counsel] And the conversation that you had with Mrs. Koucoules in the bedroom, just before she left as it relates to guns was twofold. One - - - 'Hey, the gun has to be in the dresser; let's look'?

"A Yes.

"Q And two, if it's not in the dresser, it may be in the cellar; why don't you look down there and she told you about the black bag?

"A Yes.

"Q That was the extent of the bedroom conversation?

"A Yes.

"Q And if anyone else were to say that the bedroom conversation was broader in scope than that, they would be mistaken?

"A Well, I don't remember it being broader in scope.

"Q The conversation with you - - - it was with you and not with anyone else. The conversation with you was limited to that?

"A I would say yes.

\* \* \* \* \* \*

"Q [by the Court] Captain Joy, did Mrs. Koucoules ever say to you in any of your conversations with her after your first requesting if you could conduct a search of the household, 'Go ahead Larry, I hope you find what you want to in order to clear this matter up'?

"A It seems like it was something to that effect. I can't remember the exact wording."

The Justice who heard the testimony declined to construe the conversation as a limitation on the area to be searched. We certainly cannot say as a matter of law that the quoted references to a black bag in the cellar were intended to limit the right to search only to the cellar area. At best, the references to the cellar would seem to show a desire on the defendant's part to *assist* the officers in their search of the house by specifying the most probable location of the weapon within the house. Furthermore, the emphasis which the defendant places on this particular portion of the evidence overlooks the remaining testimony of the same witness, also quoted above, wherein he stated that the consent was general, without limitations, and to the effect of "look wherever you want." The Justice did not err in finding the defendant

imposed no spatial limitations on her consent to search.

## LIMITATIONS BASED ON TIME

We must next consider the *time* limits which the Justice did impose on the officers' right to search. In reviewing this ruling we must bear in mind that, as noted above, the Justice found such limitations implicitly imposed by law rather than expressly by the defendant herself. Since this conclusion represents an erroneous view of the law, we must go further and examine the record for any evidence which would have supported a finding that the defendant herself imposed time limitations which the officers exceeded. In this endeavor, we are unable to find any evidence to justify a finding of any such limitation.

In *State v. Brochu,* supra, we held that the defendant's consent given one day did not extend to the next where, in the intervening period, the consenting party had been arrested and accused of murdering his wife. For several reasons *Brochu* is inapplicable to the present facts. Most importantly, unlike the defendant in *Brochu,* Mrs. Koucoules had not been arrested during the interval between her consent and the continuation of the search. It was the supervening factor of arrest which controlled the decision in *Brochu,* and not the mere lapse of time between the permission and the actions of the police. As we stated there:

> "By nightfall, however, the defendant had ceased to be the husband assisting in the solution of his wife's death and had become the man accused of his wife's murder by poison held under arrest for hearing."

> \* \* \* \* \* \*

> "The consent of December 5 in our view should be measured on the morning of the 6th by the status of the defendant as the accused." 237 A.2d at 421.

Here, Mrs. Koucoules' ostensible role as the wife assisting in the solution of her husband's death had not changed. She had not been arrested and, on the contrary, had departed from the house with relatives to go wherever she desired.

Moreover, in *State v. Chapman,* 1969, Me., 250 A.2d 203, this Court's opinion points out that in *Brochu* the police had left the premises after the first search with no intention to return (250 A.2d at 212), which is just the opposite of the case here presented. Here, it cannot be said that the resumption of the search was an afterthought or a completely new and unrelated effort. It would be unrealistic to conclude that the officers, knowing where the gun was, adjourned their investigation with no intention thereafter to continue the interrupted search and take possession of the weapon that same afternoon. *Brochu* may also be distinguished in that it involved an independent second-day search, while the search in the instant case was a continuous, although temporarily recessed, search executed during the course of a single day during which the police were at all times in complete control of the residence.

In *People v. Chism,* supra, the Michigan Court of Appeals, although holding invalid the search of a residence on a day following the initial consensual search, distinguished the situation where there is a *"continuing or subsequent search on the same day . . . ."* 189 N.W.2d 435 (Emphasis added). On further appeal, the Michigan Supreme Court found the second search valid on other grounds, and in reaching its decision, the Court discussed the issue of the scope of the defendant's consent. The Court first noted that the admissibility of evidence seized in the second search depends upon the actual scope of the consent given. The written consent form signed by the defendant authorized

" 'a complete search of my residence . . . to take from my residence any letters, papers, materials or other property which they may desire.' " 211 N.W. 2d at 204.

After aptly characterizing this consent as "broad," the Court said:

"The officers were merely completing the search which had begun on the previous day. The defendant's consent, under these narrow facts, might be construed to be broad enough to authorize the seizure on October 12, [the next day] but it is unnecessary for this Court to so hold, because it is clear that the wife had the power to consent to, and did consent to, the second search." 211 N.W.2d at 204.

Justice Levin, concurring, was of the opinion that the original consent was in fact sufficiently broad to sustain the second seizure which occurred some 30 hours after the consent. 211 N.W.2d at 213.

In the present case, it is also unnecessary for this Court to decide, whether the defendant's consent would have been broad enough to sanction a new or continued search on the day following the consent. Here the question is only whether it was broad enough to sanction a search during the afternoon of October 1, within a few hours of the consent itself. We hold that it was.

■ The mere lapse of time between the consent and the search does not require a reaffirmation of the consent as a condition precedent to a lawful search. *People v. Fasbinder*, 1971, 133 Ill.App.2d 322, 273 N.E.2d 249. Nor does a consent search of extended duration automatically lose its validity at some arbitrary and unspecified hour. See, *Steigler v. State*, 1971, Del. Supr., 277 A.2d 662 (15 hour search sustained), modified as to death penalty, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760.[5]

■ In the present case, there is no testimony whatsoever indicating that the defendant expressly or implicitly imposed any temporal limitations on her consent to

search. Nor did she withdraw it at any time, and her departure from the residence, coupled with her failure to return for at least several days, supports the view that she was at best apathetic to the continued police presence in her home. Had the police in fact remained for several days, a different question might be presented. As it is, we must hold that their search during the afternoon of October 1 was well within the broad scope of the consent which, by her words and actions, the defendant herself defined.

The defendant contends, however, contrary to the express finding of the Justice below, that the defendant's apparent consent to the search of the dwelling was invalid, and, therefore, the fruits of the warrantless search should have been suppressed. The claim of error is articulated in this fashion: (1) the Justice erred in applying a preponderance of the evidence standard to determine that Mrs. Koucoules had the capacity to consent and in concluding therefrom that she in fact consented freely, understandingly and intelligently to the search of her home; (2) in any event the finding of sufficient capacity is clearly erroneous; (3) most of the police testimony was so incredible as to be unworthy of belief as a matter of law; and (4) even if there was a valid consent, nothing seized was seized "pursuant" thereto.

## CAPACITY TO CONSENT

■ The Justice below expressly found capacity and consent by only a preponderance of the evidence. The defendant relies on *State v. Collins*, 1972, Me., 297 A.2d 620, for her contention that the requisite evidentiary standard should be beyond a reasonable doubt. In *Collins*, we applied a standard higher than that which the Supreme Court announced in *Lego v. Twomey*, 1972, 404 U.S. 477, 92 S.Ct. 619, 30 L.

5. A petition for habeas corpus was denied in Federal Court, but the Court there sustained the warrantless search under the doctrine of exigent circumstances. *Steigler v. Anderson*, 1973, D.Del., 360 F.Supp. 1286.

Ed.2d 618, to determine the voluntariness of a confession. The defendant assumes that the evidentiary standard for showing a valid waiver of Fourth Amendment rights should be no less than the *Collins* standard for Fifth Amendment waivers.

Although the argument is supported by at least the simplistic appeal of consistency, we consider it foreclosed by our more recent decision in *State v. Heald*, 1973, Me., 314 A.2d 820, 828–829. In *Heald*, we distinguished *Collins* and stated that, for cases raising Fourth Amendment claims (and claims arising under the comparable Article I, section 5 of our own Constitution) we would follow the preponderance standard of *Lego v. Twomey*.

In *Heald*, the question presented was whether the facts giving rise to probable cause need only be proved by a preponderance of the evidence. The question, admittedly, is factually different from our present inquiry, whether the defendant had and exercised the capacity to consent to a Fourth Amendment waiver, but, as in *Heald*, we are not persuaded that implementation of the exclusionary rule in the case of searches and seizures requires that we impose upon the State in respect to the issue of voluntary consent any more rigorous burden than was minimally enjoined in *Lego v. Twomey*. *United States v. Matlock*, 1974, 415 U.S. 164, 94 S.Ct. 988 (at page 996 and note 14), 39 L.Ed.2d 242; *United States v. Marshall*, 1973, 9 Cir., 488 F.2d 1169, 1186; *United States v. Fernandez*, 1972, 2 Cir., 456 F.2d 638, 640. Compare *Luton v. State*, 1973, Miss., 287 So.2d 269, 271–272.

It is clear from the totality of the evidence that the Justice could find as he did, that the defendant expressed herself in words and actions indicative of consent. The question to be decided is, whether the evidence was also sufficient to show that, at the time she so acted, she had sufficient capacity to know and understand what she was doing.

■ Whether a given consent to a search in a particular case was in fact voluntary or the product of duress, coercion, express or implied, is a question of fact to be determined from the totality of the surrounding circumstances. *Schneckloth v. Bustamonte*, 1973, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854; *State v. Barlow*, 1974, Me., 320 A.2d 895.

■ The question of voluntariness necessarily includes a *knowing* approval and involves an inquiry as to the capacity of the consenting party to give a knowledgeable and intelligent consent, which also is a question of fact. *United States v. Elrod*, 1971, 5 Cir., 441 F.2d 353; *People v. Gurley*, 1972, 23 Cal.App.3d 536, 100 Cal.Rptr. 407; *Muegel v. State*, 1971, 257 Ind. 146, 272 N.E.2d 617; *Zimmer v. State*, 1970, 206 Kan. 304, 477 P.2d 971; see also, *United States v. Stone*, 1972, 7 Cir., 471 F.2d 170, cert. denied, 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391.

■ The "clearly erroneous" test applies to questions of fact determined by the lower Courts on motions to suppress evidence alleged to have been illegally seized. *State v. Barlow*, supra.

The evidence is extensive regarding Mrs. Koucoules' capacity to consent to a search of her home. She professes amnesia as to everything that may have transpired subsequent to her return to the house with Mr. Berube on the day in question. Dr. Evans, her regular physician, testified that in his opinion her claimed amnesia was real. Dr. Evans did not see or hear Mrs. Koucoules on October 1; in fact he did not see her until October 30th. At the suppression hearing he testified as to his opinion based hypothetically on the testimony of those who observed the defendant on the day in question.

There was some testimony to the effect that Mrs. Koucoules refused to accept the fact that her husband was dead; that she sought a sweater to keep him warm; that she expected him to be taken to a hospital;

and that she persisted in her desire to obtain a sweater for her husband even after being told of his death. Additionally, she at one point called her son-in-law by her son's name; she appeared at times to some witnesses to have been sedated, although the doctor had given her no medication; and she complained of the cold, although other witnesses did not find the house particularly cold.

Dr. Evans at one point characterized her condition as a delirium or fugue state. A fugue state is one in which there is a total absence of communication. At another point in his testimony, he stated that she was not in a fugue state on October 1, but rather, in a state of "acute situation delirium." In this condition, he testified, Mrs. Koucoules could still have responded to questions and conversed in an apparently reasonable fashion. In his opinion, however, until Mrs. Koucoules accepted the death of her husband, a decision relating thereto "wouldn't be valid," and the search would not exist in her mind until the fact of her husband's death had been fully integrated into her thinking. He further testified that she obviously knew that *something* was wrong with her husband, that she was not retreating from her desire to assist the officers, and that she certainly acted rationally in pointing out to the officers the location of various objects throughout the house.

Dr. Bachrach, who had observed Mrs. Koucoules for 15 or 20 minutes on the day in question, testified that she was quiet and subdued when he first approached her. He told her of her husband's death and asked what had happened. Speaking unemotionally, she told him that she had gone upstairs during the night to see her son, had fallen asleep there, later came back downstairs and attempted to wake her husband to advise him of her return; when she was unable to wake him, she went next door.

The doctor testified that she seemed rational and coherent, and reacted very little to the news of her husband's death. He described her as being "almost in a depressed sort of state," "subdued," "rational," and "quite unlike what I would have suspected." Her condition was consistent with "emotional shock," and although she spoke intelligently, he felt she was disassociated with reality. He distinguished emotional shock from physiological shock, describing emotional shock as a condition which, if intensified, could result in amnesia. He explained that partial memory would not be inconsistent with the defendant's claimed amnesia because:

"You tend to screen out some _ _ _ you may objectively [sic] tend to screen out some things and you almost remember what you want to remember and leave out what you don't want to remember, but the person can go on and *tell you exactly what is going on* and yet twenty-four hours later not remember it." (Emphasis added).

Dr. Bachrach further testified that irrational acts are generally not associated with emotional shock, and that the only irrationality he detected on the defendant's part was that she acted unemotionally. He concluded by saying that he had no opinion "as to the probability on her ability to make a rational judgment."

The evidence also shows that Mrs. Koucoules personally knew the officers who testified respecting the circumstances surrounding the events in question. When the first officers arrived at the scene, she asked them to call (Captain) Larry Joy with whom she had gone to school. Officer Fournier testified that she addressed him by his first name. She assisted in the search and accurately directed Captain Joy to the cellar as to the black bag in which her husband usually kept the handgun. She told at least two other witnesses the same story she had told Dr. Bachrach, and both witnesses testified that she spoke clearly and coherently.

The terms used by various witnesses to describe the defendant's condition range from calm, cooperative, normal, rational,

and appearing to know "exactly what she was doing," to shocked, dumbfounded, dazed, upset, sobbing, crying hysterically, passive, and disassociated with reality.

The problem of evaluating the subjective capacity of an individual is indeed a difficult one for the fact finder. Regardless of Mrs. Koucoules' ability to accept the *death* of her husband, it was clear to the presiding Justice that she subjectively integrated into her thinking the fact that the police desired to search the house for evidence connected with whatever was wrong with him. By her actions and words, she expressed an understanding of this desire and she assumed a posture of complete cooperation. She herself removed the drawers of the bureau in search of the weapon, and subsequently directed the officers to look in the cellar *for the weapon.* She was thus aware of the fact that a weapon was sought; she was aware of where it might be, and, after telling the officers where to look, she must have been aware of the fact that they would then go and search. By asking earlier whether the officers had found the weapon in the bureau, she again indicated an awareness of the fact that the privacy of her home was being officially invaded.

With such evidence in the record, we cannot say that the presiding Justice, in applying the preponderance of the evidence test, was clearly wrong in concluding that Mrs. Koucoules did possess sufficient mental capacity to know, understand, and consent to that invasion.

The case of *People v. Gurley,* 1972, 23 Cal.App.3d 536, 100 Cal.Rptr. 407, presents a fact pattern remarkably similar to that of the present case. In that case, it was argued that the defendant lacked capacity to consent to a search of his vehicle, due to the combined effects of intoxication from drugs and alcohol, emotional stress, and the psychological shock occasioned by his wife's death. The defendant had administered two doses of heroin to himself and had assisted his wife in administering

the drug to herself. He later found her unconscious. He attempted unsuccessfully to revive her and thereafter drove to a nearby town with his wife and young son seeking medical assistance. After being advised by a doctor that his wife was dead, the defendant attempted to revive her by mouth-to-mouth resuscitation. He was subsequently removed from his wife's body by police officers summoned by the doctor. After being advised of his rights, the defendant told the officers what had happened and directed them to the heroin and related paraphernalia in the glove compartment of his car. The defendant was described as being at times upset, excited, crying, sobbing, passive, and hysterical, and, at other times, coherent, calm, cooperative, and "'completely alert to anything that would help his wife in any way whatsoever, or his son.'" 23 Cal. App.3d at 545, 100 Cal.Rptr. at 413. He was admitted to a psychiatric ward on the recommendation of the doctor who had pronounced his wife dead. The admitting physician described him as being in a state of acute psychiatric distress. The defendant remembered nothing subsequent to his efforts to revive his wife until he woke up in the hospital. At trial, expert witnesses spoke of a "veil" between the defendant and reality which, in their opinion, impaired his ability to comprehend the true significance of what was said to him. One doctor opined that he lacked the capacity understandingly to waive his rights. There was also evidence that he could not fully assimilate the fact of his wife's death and that he was in a type of "dream state."

In *Gurley,* the Court below decided against the defendant on the factual issue of capacity and the reviewing Court sustained the finding. In upholding the finding of sufficient capacity, the Court, using language applicable to the present case, emphasized the particular function of reviewing Courts with respect to such matters:

"In this case this court is merely reviewing the record below which is nei-

ther so overwhelming, nor is it devoid of evidence to sustain the trial judge's conclusion." 23 Cal.App.3d at 551, 100 Cal. Rptr. at 417.

The Court also observed:

"The trial court was not obliged to accept the testimony of the defendant concerning his recollection and mental state at the time he conversed with the officers, nor was it required to accept the opinion of defendant's expert witnesses with respect to the defendant's mental condition at a time they did not observe him." 23 Cal.App.3d at 550, 100 Cal. Rptr. at 417.

In the present case, the presiding Justice stated expressly that, while he did not disregard the testimony of Doctor Evans, he attached less weight to it in view of the fact the doctor had not been present at the time of the consent. The Justice placed great weight on other evidence showing that the defendant "was able to distinguish and recognize individuals . . .," "was able to recite a logical sequence of events of that morning . . .," and "was able to identify where various things were located in her home as demonstrated by her suggesting to Captain Joy there was a black bag in the basement with hunting equipment and the gun might be there, his finding it indeed in the basement, the black bag with some .22 caliber ammunition in it."

The defendant relies on *United States v. Elrod,* 1971, 5 Cir., 441 F.2d 353. In *Elrod,* however, the Court of Appeals merely upheld the District Court's finding of incapacity where the consenting party was so intoxicated and deranged as not to know what he was doing. In holding that the finding of incapacity was not clearly erroneous, the Court stated that:

"The question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had a reasonable appre-

ciation of the nature and significance of his actions." 441 F.2d at 355.

*Elrod* exemplifies a case in which the factual issue was resolved *by the fact finder* in favor of incapacity. For cases, such as *Gurley,* supra, illustrating situations in which the fact finder's determination of sufficient capacity was upheld, notwithstanding evidence of amnesia, intoxication, and mental and emotional distress, see, *Muegel v. State,* supra (intoxication); *Zimmer v. State,* supra (amnesia, drugs); *Guest v. State,* 1973, 230 Ga. 569, 198 S.E. 2d 158 (mental patient who had escaped from the institution).

 In concluding that the evidence in the present case was sufficient to support the trial Justice's finding of capacity, we reject the defendant's suggestion that certain testimony should have been disregarded as a matter of law. The credibility of witnesses falls exclusively within the province of the fact finder. *Perkins v. Conary,* 1972, Me., 295 A.2d 644; *Garland v. Vigue,* 1967, Me., 236 A.2d 324; *Stewart v. Stewart,* 1948, 143 Me. 406, 59 A.2d 706.

 In the present case, the conflicts in the testimony of the officers essentially relate to the exact time of various events, the particular room in which a particular statement may have been made, and precisely which individuals may have been present at the time. Although contradictions in the testimony of witnesses are important factors for consideration by the fact finder in evaluating credibility, the mere fact that the witnesses in the instant case did not agree as to every minute detail respecting the circumstances surrounding the defendant's consent did not render their testimony utterly incredible. The inconsistencies in the police testimony were not so significant as to preclude the presiding Justice from finding that the State had sustained the burden of proving Mrs. Koucoules had given a free and voluntary consent to the search by the fair preponderance of the evidence. See, *United States v. Rothberg,* 1972, 2 Cir., 460 F.2d 223.

## SEIZURE PURSUANT TO CONSENT

 The defendant's final argument on the consent issue is that, even if we assume a valid consent, nothing was seized pursuant thereto. The argument rests on the assumption the consent gave only a limited authority to search which had expired or which had been relinquished prior to any seizure. The contention must fail in view of our holding that the consent was not so limited. The authority conferred by Mrs. Koucoules continued throughout the afternoon and it is immaterial that the officers conducting the search may have mistakenly believed otherwise, when they interrupted the search to seek a warrant. Their own view of the source of their authority is not determinative of the lawfulness of a search. In *State v. Brochu,* supra, the officers' erroneous belief that they had a valid consent to search did not render the search unlawful, where there was also a valid, although "unexecuted," warrant authorizing the search. And in *State v. Thibodeau,* 1974, Me., 317 A.2d 172, we relied on *Brochu* to hold the officers' mistaken belief that they were acting pursuant to the authority of a warrant did not render the search illegal, where there was also a valid consent which authorized the search.

In the present case, there is not a scintilla of evidence which would suggest that, in seeking a warrant, the officers themselves believed the consent was invalid or had expired. The election to obtain a warrant on the advice of counsel might be viewed to reflect only an overabundance of caution.

In conclusion, we hold that the Justice below was correct in ruling that the .22 caliber gun and holster found in the attic were properly seized by the police and his denial of the defendant's motion to suppress the same was not error. His sup-

pression, however, of the ladder, the insulation and the cover of the crawl space, all items in plain view in the course of the search for the gun, was error as a matter of law and the State's appeal in respect thereto must be sustained.[6]

The entry will be

Defendant's interlocutory appeal denied.

State's interlocutory appeal sustained.

Case remanded for further proceedings consistent with this opinion.

All Justices concurring.

---

6. Since we have disposed of the reasonableness of the search and the ensuing seizures on the ground of a valid consent on the part of Mrs. Koucoules, we need not consider the applicability of *State v. Chapman,* 1969, Me., 250 A.2d 203, nor is it necessary to rule upon the contentions of the State respecting the alleged validity of the search warrant.